UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| RONNOCO COFFEE, LLC, and <br> MID-AMERICA ROASTERIE, LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> WESTFELDT BROTHERS, INC., <br><br> Defendant. | Case No. 4:16CV1336 JCH |

# MEMORANDUM AND ORDER

This matter is before the Court on the Motion to Dismiss of Plaintiffs/Counterclaim Defendants Ronnoco Coffee, LLC and Mid-America Roasterie, LLC, and Third-Party Defendants Scott Meader and Eric Bomball. (ECF No. 18). The motion is fully briefed and ready for disposition.

## BACKGROUND[1]

Westfeldt Brothers, Inc. ("Westfeldt") is a corporation organized and existing under the laws of the State of Louisiana, with its principal place of business in New Orleans, Louisiana. (Counter-Claims and Third Party Complaint ("Counterclaim"), ¶ 1). Westfeldt is in the business of importing green coffee to supply to coffee roasters. (*Id.*, ¶ 9).

Sometime in 2010, U.S. Roasterie, Inc. ("U.S. Roasterie") became a customer of Westfeldt. (Counterclaim, ¶ 10). Throughout their course of dealing, Westfeldt and U.S. Roasterie entered into futures contracts for the purchase of green coffee. (*Id.*, ¶ 11). Over time, U.S. Roasterie became delinquent in its payments due under the terms of the futures contracts. (*Id.*, ¶ 12).

---

1 The Court's background section is taken from Westfeldt's Counter-claims and Third Party Complaint, to which

In the late summer or fall of 2014, U.S. Roasterie and Counterclaim Defendant Ronnoco Coffee, LLC ("Ronnoco Coffee") entered into negotiations for the sale of U.S. Roasterie's assets to Ronnoco Coffee. (Counterclaim, ¶¶ 2, 13). In conducting due diligence during the negotiations, Ronnoco Coffee became aware of the substantial debt that Westfeldt had allowed U.S. Roasterie to incur. (*Id.*, ¶ 14). Ronnoco Coffee ultimately did not complete the purchase of U.S. Roasterie's assets.[2]

At some subsequent point U.S. Roasterie's lender, Great Western Bank, took control of the assets of U.S. Roasterie. (Counterclaim, ¶ 17). All of U.S. Roasterie's assets then were formally acquired by Counterclaim Defendants Ronnoco Coffee and Mid-America Roasterie, LLC ("Mid-America")[3], pursuant to a Sale Agreement dated February 9, 2015. (*Id.*, ¶¶ 3, 26). That same day Westfeldt received two nearly identical letters, one from Ronnoco Coffee and one from Dixon Avenue Holdings, LLC[4], notifying it that the assets of U.S. Roasterie had been taken over by Great Western Bank and then sold to Mid-America, a subsidiary of Ronnoco Coffee, and that no invoices prior to the asset sale would be paid because Ronnoco Coffee did not assume any of U.S. Roasterie's liabilities. (*Id.*, ¶ 28).[5]

On or around the day after the asset sale closing, a telephone conference took place between Ronnoco Coffee, U.S. Roasterie's former CEO and CFO, and Westfeldt. (Counterclaim, ¶ 30). According to Westfeldt, Ronnoco Coffee expressly agreed during the conference to assume certain futures contracts that were previously in place between Westfeldt and U.S. Roasterie. (*Id.*).

---

Counter-Claim and Third Party Defendants have not yet filed an answer.
2 According to Westfeldt, Ronnoco Coffee and U.S. Roasterie instead formulated a mutually beneficial plan, whereby Ronnoco Coffee could acquire U.S. Roasterie's assets free and clear of the substantial debt owed to Westfeldt. (Counterclaim, ¶ 16).
3 According to Westfeldt, Mid-America was created prior to the asset sale, in an attempt to shield the actual buyer, Ronnoco Coffee, from liability related to the transaction. (Counterclaim, ¶ 25).
4 According to Westfeldt, Dixon Avenue Holdings, LLC was created prior to the asset sale, in an attempt to shield the actual seller, U.S. Roasterie, from liability related to the transaction. (Counterclaim, ¶ 25).

Westfeldt maintains that although Ronnoco Coffee/Mid-America (collectively "Ronnoco") initially took delivery of the coffee subject to the futures contracts, it later informed Westfeldt that it would not continue taking delivery in fulfillment of the remaining assumed futures contracts. (*Id.*, ¶ 33). Westfeldt further alleges that as of September, 2016, the value of the outstanding futures contracts assumed by Ronnoco was $145,776.88. (*Id.*, ¶ 34).

Westfeldt filed its Counterclaim against Ronnoco on September 22, 2016. (ECF No. 9).[6] In its Counterclaim, Westfeldt asserts the following claims against Ronnoco: Breach of Contract/Successor Liability (Count I); Open Account/Successor Liability (Count II); Breach of Contract/Single Business Entity/Alter Ego (Count III); Open Account/Single Business Entity (Count IV); Unfair Trade Practices (Count V); Conversion/Civil Conspiracy to Commit Conversion (Count VI); Unjust Enrichment (Count VII); and Breach of Futures Contracts (Count VIII). Westfeldt also asserts a claim for Tortious Interference with Contractual Relations/Conspiracy to Tortiously Interfere with Contractual Relations against Third-Party Defendants Scott Meader and Eric Bomball. (Count IX).[7]

As noted above, Ronnoco, Meader and Bomball (collectively "Movants") filed the instant Motion to Dismiss on October 20, 2016, asserting all Westfeldt's counterclaims and third-party claims must be dismissed for failure to state a claim upon which relief can be granted. (ECF No. 18).

## STANDARD FOR MOTION TO DISMISS

In ruling on a motion to dismiss, the Court must view the allegations in the complaint in the light most favorable to plaintiff. *Eckert v. Titan Tire Corp.*, 514 F.3d 801, 806 (8th Cir. 2008). The

---

5 According to Westfeldt, as of September, 2015, U.S. Roasterie was in breach of 77 contracts with Westfeldt, and owed a total balance of $2,930,147.10 to Westfeldt. (Counterclaim, ¶ 27).
6 Westfeldt's Counterclaim was filed in response to Ronnoco's Complaint for Declaratory Relief, filed August 17, 2016). (ECF No. 1).

Court, "must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party." *Coons v. Mineta*, 410 F.3d 1036, 1039 (8th Cir. 2005) (citation omitted). The complaint's factual allegations must be sufficient "to raise a right to relief above the speculative level," however, and the motion to dismiss must be granted if the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007) (abrogating the "no set of facts" standard for Fed.R.Civ.P. 12(b)(6) found in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). Furthermore, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 555 (pleading offering only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not do)).

## DISCUSSION

### I. Successor Liability (Counts I-II)

#### A. Choice Of Law

In their Motion to Dismiss, Movants first ask that the Court apply Iowa law to Counts I and II of Westfeldt's Counterclaim. (Memorandum in Support of Motion to Dismiss of Movants ("Movants' Memo in Support"), PP. 10-11). "A district court sitting in diversity must apply the conflict of law rules for the state in which it sits." *Inacom Corp. v. Sears, Roebuck and Co.*, 254 F.3d 683, 687 (8th Cir. 2001) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). "Missouri has adopted the Restatement (Second) of Conflict of Laws which uses the 'most significant relationship' test to determine which state's laws govern."

---

7 Count IX is improperly labeled Count IV in Westfeldt's Counterclaim.

*Taylor v. Cottrell, Inc.*, 2015 WL 8021729, at *1 (E.D. Mo. Dec. 7, 2015) (citations omitted).[8] *See also Dorman v. Emerson Elec. Co.*, 23 F.3d 1354, 1358 (8th Cir.) (citation omitted) ("Missouri courts apply the most-significant-relationship test as defined in the Restatement. Under this test, the identity of the state having the most significant relationship will depend upon the nature of the cause of action and upon the particular legal issue in dispute."), *cert. denied*, 513 U.S. 964 (1994).

In order to determine which state has the most significant relationship with a particular issue, the Court must consider Restatement (Second) of Conflict of Laws § 6, which provides in relevant part as follows:

> (2) [T]he factors relevant to the choice of the applicable rule of law include
>
> > (a) the needs of the interstate and international systems,
> > (b) the relevant policies of the forum,
> > (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> > (d) the protection of justified expectations,
> > (e) the basic policies underlying the particular field of law,
> > (f) certainty, predictability and uniformity of result, and
> > (g) ease in the determination and application of the law to be applied.

For contract claims, the Court further considers § 188, which provides in relevant part as follows:

> (2) In the absence of an effective choice of law by the parties….the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
> > (a) the place of contracting,
> > (b) the place of negotiation of the contract,
> > (c) the place of performance,
> > (d) the location of the subject matter of the contract, and
> > (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.
>
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

---

8 The most significant relationship test "is applied individually to each particular issue under the principle of '*depecage*.'" *Taylor*, 2015 WL 8021729, at *1 (citing *Johnson v. Avco*, No. 4:07CV1695 (E.D. Mo. 2009) (under the "conflict of law doctrine of *depecage*, different issues in a single case may be decided by laws of different states, if those states have the most significant relationship to those particular issues.")).

As noted above, Counts I and II of Westfeldt's Counterclaim attempt to hold Ronnoco liable on a theory of successor liability. (Counterclaim, ¶¶ 35-54). Specifically, the issue raised is whether Ronnoco can be held liable as a successor to U.S. Roasterie by virtue of its purchase of U.S. Roasterie's assets from Great Western Bank. By the terms of Westfeldt's Counterclaim, this issue requires the Court to consider whether Ronnoco assumed the liabilities by virtue of the Sale Agreement (Counterclaim, ¶¶ 39, 49), whether Ronnoco is a "mere continuation" of U.S. Roasterie (*Id.*, ¶¶ 40-42, 50-52), and/or whether the sale of assets was a transaction entered into in order to escape liability (*Id.*, ¶ 43, 53).

Upon consideration of the foregoing, the Court finds that Iowa law controls the successor liability issue in this case, as Iowa clearly has the most significant contacts with the transaction at issue. As noted by Ronnoco, the issue of whether it can be held liable as a successor to U.S. Roasterie "implicate[s] only an Iowa transaction that involved the sale of assets located in Iowa, previously owned by an Iowa company [*i.e.*, U.S. Roasterie], sold in accordance with Iowa law, pursuant to a Sale Agreement containing an Iowa choice-of-law provision." (Reply Memorandum in Support of Motion to Dismiss ("Movants' Reply"), P. 4). Iowa thus has a significant relationship with the transaction allegedly creating the successor liability, whereas Louisiana would appear to have little interest in the sale of assets from U.S. Roasterie (through Great Western Bank) to Ronnoco. *John Q. Hammons Hotels, Inc. v. Acorn Window Systems, Inc.*, 2003 WL 21397710, at *5 (N.D. Iowa Feb. 11, 2003). The Court therefore will apply Iowa law to determine which liabilities, if any, were conveyed when Ronnoco purchased the assets of U.S. Roasterie from Great Western Bank. *See Id.*

B. **Application**

Under Iowa law, the basic principle of corporate successor liability is that "a corporation that purchases the assets of another corporation assumes no liability for the transferring corporation's debts and liabilities. Exceptions arise only in four circumstances: (1) the buyer agrees to be held liable; (2) the two corporations consolidate or merge; (3) the buyer is a 'mere continuation' of the seller; or (4) the transaction amounts to fraud." *Lumley v. Advanced Data-Comm, Inc.*, 2009 WL 2514084, at *1 (Iowa App. Aug. 19, 2009) (citations omitted). In its response brief, Westfeldt contends that the third and fourth exceptions apply in this case. (Westfeldt's Memorandum in Opposition to Movants' Motion to Dismiss ("Westfeldt's Opp."), PP. 12-16).[9]

With respect to exception four, "Iowa courts have not elaborated on the elements of such a claim." *Grand Laboratories, Inc. v. Midcon Labs of Iowa*, 32 F.3d 1277, 1281 (8th Cir. 1994). "Authorities suggest, however, that 'the fraud exception to the nonliability of successors is merely an application of the law of fraudulent conveyances.'" *Id.* (citations omitted). After concluding that the Iowa law of fraudulent conveyances applied to the claim before it, the Eighth Circuit in *Grand Laboratories* continued as follows:

> A fraudulent conveyance is…a transaction by means of which the owner of real or personal property has sought to place the land or goods beyond the reach of his creditors, or which operates to the prejudice of their legal or equitable rights. To recover on a fraudulent conveyance claim, a plaintiff-creditor must first show that the transferor actually owned the property that it allegedly fraudulently transferred. Moreover, the plaintiff-creditor must show that it was prejudiced by a transfer of

---

9 As noted above, in its Counterclaim Westfeldt alleges exception one applies as well. (*See, e.g.*, Counterclaim, ¶ 39 ("Despite language in the February 9, 2015 Sale Agreement (Ex. A) which purported to carve out certain 'assets' from the sale, Ronnoco, in reality, purchased all of the assets of U.S. Roasterie under the Sale Agreement."). Upon consideration the Court disagrees, as it finds the Sale Agreement cannot be interpreted to constitute an agreement on the part of Ronnoco to assume U.S. Roasterie's pending obligations. Rather, the Sale Agreement expressly disavowed any assumption of U.S. Roasterie's debts and obligations, as follows: "Ronnoco is not assuming and will have no obligation to assume, perform, or discharge any liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise, of [U.S. Roasterie]….all of which will remain the sole responsibility and obligation of [U.S. Roasterie]." (ECF No. 9-1, P. 2).

assets. Prejudice requires the creditor to show that [it] would have received something which has become lost to [it] by reason of the conveyance.

*Id.* at 1281-82 (internal quotations and citations omitted).

With respect to this claim, Westfeldt alleges in relevant part as follows:

16.  Upon information and belief, Ronnoco and U.S. Roasterie formulated a mutually beneficial plan so that Ronnoco could acquire all of U.S. Roasterie's assets free and clear of the substantial debt owed to Westfeldt, and U.S. Roasterie's management and employees could all maintain their employment at the new contemplated successor company.

17.  Pursuant to this plan, the parties caused or allowed U.S. Roasterie's lender, Great Western Bank, to "take control" of the assets of U.S. Roasterie so that U.S. Roasterie's assets would be sold to Ronnoco by the bank at a lesser cost rather than being sold directly by U.S. Roasterie….

29.  After the asset sale was finalized, Howard Fischer, the former CEO of U.S. Roasterie, and Scott Meader, Ronnoco's CEO, gave a joint statement to VendingMarketWatch in which Mr. Fischer stated that the sale of U.S. Roasterie to Ronnoco was part of his "exit strategy," and noted that "people at U.S. Roasterie will continue in their current roles" and "all blends, packaging and outstanding customer service remain the same."…

43.  ….[B]ecause the sale of the assets of U.S. Roasterie was a transaction entered into to escape liability, Ronnoco/Mid-America is liable to Westfeldt for the debts of U.S. Roasterie via successor liability….

(Counterclaim, ¶¶ 16-17, 29, 43). Upon consideration the Court finds that with these allegations, Westfeldt successfully has pled a claim for successor liability on the basis that the transaction at issue amounted to fraud.[10] This portion of Movants' Motion to Dismiss will therefore be denied.[11]

## II.     Single Business Entity/Alter Ego (Counts III-IV)

---

10 The Court recognizes Westfeldt has a long way to go to prove that the sales transaction was fraudulent, especially in light of the fact that Ronnoco purchased U.S. Roasterie's assets not from the company itself, but from U.S. Roasterie's secured lender, Great Western Bank, who had foreclosed on the property. *See Grand Laboratories*, 32 F.3d at 1282 (holding plaintiff's claim for successor liability on the basis of a fraudulent transfer of assets failed, as plaintiff presented no evidence that the seller had no other creditors, that plaintiff was entitled to priority over other creditors to any extent, or that the assets the seller transferred were unencumbered). Nevertheless, the Court declines to dismiss Westfeldt's successor liability claims at this early stage, as it finds consideration of the issue to be more appropriate on summary judgment, when the Court has a full record before it.
11 In light of the above ruling, the Court need not consider whether Westfeldt successfully has pled a claim for successor liability on the basis that Ronnoco is a mere continuation of U.S. Roasterie.

In Counts III and IV of its Counterclaim, Westfeldt attempts to hold Ronnoco liable for U.S. Roasterie's nearly three million dollar debt on the theory of single business entity and/or alter ego. (Counterclaim, ¶¶ 55-95). Upon consideration, however, the Court finds that Westfeldt's claims are pled in too conclusory a manner to permit consideration of the grounds for dismissal raised in Movants' motion. For example, the Court notes that in Count III Westfeldt alleges, *inter alia*, that Ronnoco effectively controlled U.S. Roasterie; that there was unified administrative control of the two entities; that Ronnoco financed or effectively financed U.S. Roasterie; that U.S. Roasterie was inadequately capitalized; and that U.S. Roasterie did not comply with corporate formalities. (*Id.*, ¶¶ 60, 62, 64-65, 67). Westfeldt offers no support for these allegations in its background section, however; instead, Westfeldt seemingly acknowledges that rather than controlling U.S. Roasterie's actions throughout, Ronnoco only became aware of the significant debt U.S. Roasterie had incurred while conducting due diligence in connection with a potential asset purchase. (*Id.*, ¶¶ 13-14). Under these circumstances, the Court finds Westfeldt's claims of single business entity/alter ego inadequately pled, and subject to dismissal. The Court will, however, grant Westfeldt's request for leave to amend its Counterclaims.

### III. <u>Unfair Trade Practices, Conversion, and Unjust Enrichment (Counts V-VII)</u>

In Counts V, VI and VII of its Counterclaim, Westfeldt attempts to assert claims for unfair trade practices, conversion/civil conspiracy to commit conversion, and unjust enrichment. (Counterclaim, ¶¶ 96-111). In its Motion to Dismiss Ronnoco asserts the claims are wholly conclusory, and lack sufficient factual support. (Movants' Memo in Support, P. 17). Ronnoco states: "Westfeldt alleges unfair trade practices without alleging what specific conduct of Plaintiffs was immoral, unethical, oppressive, unscrupulous, or unlawfully injurious to Westfeldt. Westfeldt

alleges conversion without alleging what property Plaintiffs converted. Westfeldt alleges unjust enrichment without alleging what detriment it suffered or what benefit Plaintiffs received." (*Id.*).

Upon consideration the Court agrees with Ronnoco's assessment that Westfeldt's claims are inadequately pled. As one example, the Court notes it is unclear whether with these claims Westfeldt seeks to hold Ronnoco liable for the entire amount of money it is allegedly owed (nearly three million dollars), or only for the approximately $85,000 Westfeldt claims U.S. Roasterie sent to it, but then stopped payment on under the direction of Ronnoco. This portion of Movants' Motion to Dismiss will therefore be granted. Again, however, the Court will grant Westfeldt's request for leave to amend its Counterclaims, in order to attempt to cure the deficiencies.

## IV.  Futures Contracts (Count VIII)[12]

In its Counterclaim, Westfeldt provides the following background information with respect to the futures contracts:

> 30. On or around the day after the asset sale closing, a telephone conference between Ronnoco, U.S. Roasterie's former CEO and CFO, and Westfeldt took place. During that telephonic meeting, Ronnoco expressly agreed to assume certain futures contracts, attached as Ex. E, that were previously in place between Westfeldt and U.S. Roasterie (the "Futures Contracts").
>
> 31. This verbal assumption of the Futures Contracts was then confirmed by the parties by email after the telephonic meeting.
>
> 32. The Futures Contracts were also expressly assumed under the Sale Agreement dated February 9, 2015, which is attached hereto as Ex. A.
>
> 33. Ronnoco/Mid-America initially began taking delivery of the coffee subject to the Futures Contracts, but then informed Westfeldt that they did not wish to continue taking delivery in fulfillment of the remaining assumed futures contracts.

(Counterclaim, ¶¶ 30-33). Westfeldt's breach of futures contracts claim then states as follows:

---

12 After careful consideration of the parties' arguments, the Court concludes that Iowa law applies to Westfeldt's futures contracts claim. The Court notes that Westfeldt's claims would fail under Louisiana law as well, however. *See* La. C.C. Arts. 1821, 1823, 1947.

> 113. Ronnoco assumed the Futures Contracts (attached hereto as <u>Ex. E</u>), both orally and by virtue of the Sale Agreement dated February 9, 2015 (attached hereto as <u>Ex. A</u>), but has breached those contracts by failing to render performance.
>
> 114. Ronnoco is indebted to Westfeldt for the approximate sum of $145,776.88, which includes interest that continues to accrue, due to its breach of the Futures Contracts.

(*Id*., ¶¶ 113-114). In its Motion to Dismiss, Ronnoco asserts it may not be held liable under this Count, as it assumed responsibility for the futures contracts neither by virtue of the Sale Agreement nor through any verbal agreement.

### A. **Sale Agreement**

In support of its claim that Ronnoco expressly assumed the futures contracts, Westfeldt points to the Sale Agreement between U.S. Roasterie, Great Western Bank, and Ronnoco, which lists the assets subject to the Agreement. (*See* ECF No. 9-1). In particular, Westfeldt notes the Sale Agreement provides that the assets include "[a]ll documents, instruments, investment property, letter of credit rights and supporting obligations." (*Id*., P. 19). Ronnoco counters that the Sale Agreement expressly disavows any assumption of U.S. Roasterie's debts and obligations on its part, as follows: "Ronnoco is not assuming and will have no obligation to assume, perform, or discharge any liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise, of [U.S. Roasterie]....all of which will remain the sole responsibility and obligation of [U.S. Roasterie]." (*Id*., P. 2).

Upon consideration, the Court agrees with Ronnoco that the Sale Agreement cannot be interpreted to constitute an agreement on the part of Ronnoco to assume U.S. Roasterie's obligations with respect to the futures contracts.

### B. **Verbal Agreement**

As stated above, in its Counterclaim Westfeldt asserts that during a telephone conference that took place on or around the day after the asset sale closing, Ronnoco verbally agreed to assume the futures contracts previously in place between Westfeldt and U.S. Roasterie. Westfeldt continues to assert that the verbal assumption was confirmed by the parties through an email exchange.

The Iowa statute of frauds states in relevant part as follows:

1. Except as otherwise provided in this section a contract for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by that party's authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

2. Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection 1 against such party unless written notice of objection to its contents is given within ten days after it is received.

Iowa Code § 554.2201.

In its response to Ronnoco's Motion to Dismiss, Westfeldt relies on subsection 2 of § 554.2201. Specifically, Westfeldt asserts that after Ronnoco verbally agreed to assume the futures contracts, Westfeldt sent written confirmation of the assumption via email, and because Ronnoco "failed to object to the contents of this written confirmation, the defense of statute of frauds is negated." (Westfeldt's Opp., P. 22 n. 10).

Upon consideration, the Court agrees with Ronnoco that Westfeldt's futures contracts claim fails under the Iowa statute of frauds. It is undisputed that no writing exists evidencing Ronnoco's alleged assumption of U.S. Roasterie's futures contracts with Westfeldt. While subsection two of § 554.2201 permits enforcement when a writing in confirmation of the contract is sent within a reasonable time, the writing must be "sufficient against the sender." Here, Westfeldt's email stated

only that those at Westfeldt "look forward to working with Ronnoco on the existing futures contracts we had w/USR." (ECF No. 19-1, P. 5).[13] The Court finds as a matter of law that said writing would not be "sufficient against the sender"; in other words, were the situation reversed, and Ronnoco attempted to hold Westfeldt liable under the futures contracts, it would not be able to do so pursuant to this email exchange. Specifically, the Court finds no indication in Westfeldt's email that the parties had definitively agreed to continue performing under the futures contracts; rather, the phrasing we "look forward to working with Ronnoco on the existing futures contracts" is just as easily interpreted to mean future discussion was anticipated.

The Court's holding is bolstered by its finding that even Westfeldt apparently believed that in order to be enforceable, the contracts between itself and Ronnoco had to be in writing and signed. In his February 10, 2015, email, Ryan Mckinnon of Westfeldt wrote Robert Carpenter and Scott Meader of Ronnoco, and stated in relevant part as follows: "In the meantime I will have your credit application sent to our bank for approval along with the previous [U.S. Roasterie] contracts converted to be under the name of Ronnoco Roasterie, LLC." (ECF No. 19-1, P. 5). On February 19, 2015, Mr. Mckinnon continued the email exchange as follows: *"Also, can you please send us back the signed contracts*? As you can imagine our attorneys and bank are very worried with us moving forward w/these contracts given the fact that [U.S. Roasterie] stole such a large amount of green coffee from us." (*Id.*, P. 2 (emphasis added)). In light of the foregoing, the Court finds Westfeldt clearly anticipated entering into written contracts; in fact, Westfeldt drafted the contracts itself and forwarded them to Ronnoco for signature, but the record reveals they were never signed by Ronnoco. (*See* ECF No. 9-5). Under these circumstances, Westfeldt's alleged writing in

---

13 Ronnoco's response indicated that it "look[ed] forward to working with Westfeldt as well." (ECF No. 19-1, P. 4).

confirmation of the contract fails to satisfy the Iowa statute of frauds, and this portion of Movants' Motion to Dismiss must be granted.

### V. Tortious Interference Against Meader And Bomball

In the final count of its Counterclaim, Westfeldt asserts tortious interference with contractual relations/conspiracy to tortiously interfere with contractual relations against Eric Bomball and Scott Meader. (Counterclaim, ¶¶ 115-123). As noted above, "Missouri has adopted the Restatement (Second) of Conflict of Laws which uses the 'most significant relationship' test to determine which state's laws govern." *Taylor v. Cottrell, Inc.*, 2015 WL 8021729, at *1 (citations omitted). In order to determine which state has the most significant relationship with a particular issue, the Court must consider Restatement (Second) of Conflict of Laws § 6, which provides in relevant part as follows:

> (2)   [T]he factors relevant to the choice of the applicable rule of law include
>
> (a)   the needs of the interstate and international systems,
> (b)   the relevant policies of the forum,
> (c)   the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d)   the protection of justified expectations,
> (e)   the basic policies underlying the particular field of law,
> (f)   certainty, predictability and uniformity of result, and
> (g)   ease in the determination and application of the law to be applied.

For tort claims, the Court further considers § 145, which provides in relevant part as follows:

> (2)   Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
> (a)   the place where the injury occurred,
> (b)   the place where the conduct causing the injury occurred,
> (c)   the domicil, residence, nationality, place of incorporation and place of business of the parties, and
> (d)   the place where the relationship, if any, between the parties is centered.
>
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

While admittedly a close call, the Court will apply Louisiana law to this claim. "Missouri courts apply the law of the state where the injury occurred unless some other state has a more significant relationship with the occurrence or some overriding interest." *Taylor*, 2015 WL 8021729, at *1 (citation omitted). Here, it is undisputed that the place where the injury occurred was Louisiana. Taking the other factors into consideration does not alter the applicable law, because although the conduct causing the injury may have occurred outside Louisiana, Westfeldt's place of incorporation and place of business is Louisiana, and it can be argued the relationship between the parties, if any, is centered in Louisiana as well. Under these circumstances, the Court finds Louisiana has the most significant relationship with the issues raised in Westfeldt's tort claim, and so its law will apply.

"Historically, a cause of action for tortious interference with a contract was not available in Louisiana." *Healthcare Management Serv., Inc. v. Vantage Healthplan, Inc.*, 748 So.2d 580, 582 (La. App. 1999) (citing *Kline v. Eubanks*, 109 La. 241, 33 So. 211 (1902)). In *9 to 5 Fashions, Inc. v. Spurney*, however, the Louisiana Supreme Court recognized a limited cause of action for tortious interference with contractual relations. *See* 538 So.2d 228 (La. 1989). Specifically, the Court recognized "only a corporate officer's duty to refrain from intentional and unjustified interference with the contractual relation between his employer and a third person." *Spurney*, 538 So.2d at 234.[14]

Since *Spurney*, Louisiana courts consistently have limited the cause of action recognized in *Spurney* to its facts. *See, e.g., Vantage Healthplan*, 748 So.2d at 583 (citation omitted) ("In Louisiana, this court has limited the application of *9 to 5 Fashions, Inc. v. Spurney, supra*, to its

---

14 The elements of the Louisiana cause of action are as follows: "(1) the existence of a contract or a legally protected interest between the plaintiff and the corporation; (2) the corporate officer's knowledge of the contract; (3) the officer's intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome; (4) absence of justification on the part of the officer; (5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer." *Spurney*, 538 So.2d at 234.

facts. Where the interference alleged is beyond the cause of action created in that decision, the trial court is correct in denying the claim"); *Boudreaux v. OS Restaurant Serv., L.L.C.*, 58 F.Supp.3d 634, 638 (E.D. La. 2014) (internal quotations and citations omitted) ("Louisiana courts and the Fifth Circuit have consistently refused to extend the action for tortious interference beyond the limited scope recognized in *Spurney*….In sum, the Louisiana Supreme Court has recognized a cause of action for intentional interference with contractual relations only against a corporate officer.").

As noted above, Westfeldt's tortious interference with contractual relations claim is directed against Eric Bomball and Scott Meader. According to Westfeldt, both Bomball and Meader were corporate officers of Ronnoco, not U.S. Roasterie (the company alleged to have breached the contracts with Westfeldt). (Counterclaim, ¶¶ 116-118). By their own terms then, Westfeldt's allegations do not assert a claim for tortious interference with contractual relations as recognized under Louisiana law. This portion of Movants' Motion to Dismiss must therefore be granted.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the Motion to Dismiss of Plaintiffs/Counterclaim Defendants Ronnoco Coffee, LLC and Mid-America Roasterie, LLC, and Third-Party Defendants Scott Meader and Eric Bomball (ECF No. 18) is **GRANTED** in part and **DENIED** in part, in accordance with the foregoing.

**IT IS FURTHER ORDERED** that Westfeldt's request for leave to amend its Counterclaims and Third Party Complaint is **GRANTED**, and Westfeldt is granted until **Monday, February 27, 2017**, within which to file its First Amended Counterclaims and Third Party Complaint.

Dated this 16th Day of February, 2017.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE