UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| RONNOCO COFFEE, LLC, and<br>MID-AMERICA ROASTERIE, LLC,<br><br>     Counterclaim Defendants,<br><br>     vs.<br><br>WESTFELDT BROTHERS, INC.,<br><br>     Counterclaim Plaintiff. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Case No. 4:16CV1336 JCH |

## MEMORANDUM AND ORDER

This matter is before the Court on Counterclaim Defendants Ronnoco Coffee, LLC ("Ronnoco Coffee") and Mid-America Roasterie, LLC's ("Mid-America") (collectively "Ronnoco") Motion for Summary Judgment, filed December 1, 2017. (ECF No. 96). The motion is fully briefed and ready for disposition.

## BACKGROUND

Westfeldt Brothers, Inc. ("Westfeldt") is a corporation organized and existing under the laws of the State of Louisiana, with its principal place of business in New Orleans, Louisiana. (First Amended Counter-Claims and First Amended Third-Party Complaint ("Amended Counterclaim"), ¶ 1). Westfeldt is in the business of importing green coffee to supply to coffee roasters. (*Id.*, ¶ 9).

Sometime in 2010, U.S. Roasterie, Inc. ("U.S. Roasterie" or "USR") became a customer of Westfeldt. (Westfeldt's Statement of Contested Material Facts ("Westfeldt's Facts"), ¶ 1). Over time, U.S. Roasterie became delinquent in the amounts owed to Westfeldt for the provision of coffee, due to financial difficulties it was experiencing. (*Id.*, ¶ 3). Westfeldt continued to sell coffee to U.S. Roasterie on unsecured credit, however, and as of August 21, 2012, U.S. Roasterie owed

$3,087,576.47 to Westfeldt on its account. (Ronnoco's Statement of Uncontroverted Material Facts ("Ronnoco's Facts"), ¶¶ 7, 8).[1]

In April of 2013, Westfeldt informed U.S. Roasterie that it would ship additional coffee to U.S. Roasterie only upon payment prior to the release of an amount greater than the value of the new shipment. (*See* Ronnoco's Exh. 4, ECF No. 98-1, P. 41). All such payments were applied to old invoices by Westfeldt, resulting in a reduction over time of the amounts owing to Westfeldt by U.S. Roasterie, but a continuation of the ongoing extension of credit by Westfeldt to U.S. Roasterie. (Ronnoco's Facts, ¶ 10). As a result, as of August, 2013, U.S. Roasterie's debt had been reduced to approximately $2,962,000, of which over $1,900,000 was over 90 days past due. (*Id.*, ¶ 12).[2]

Sometime in 2013, Ronnoco Coffee, through its then-CEO Scott Meader ("Meader") and then-President Dan Moloney, traveled to Iowa to meet with U.S. Roasterie President Howard Fischer ("Fischer"), to discuss a potential acquisition of U.S. Roasterie. (Westfeldt's Facts, ¶ 9). No deal was reached at that time, but negotiations resumed in approximately February, 2014. (*Id.*, ¶¶ 9, 10). In conducting due diligence during the negotiations, Ronnoco Coffee became aware of the substantial debt that U.S. Roasterie had accrued in favor of its coffee supplier, Westfeldt. (*Id.*, ¶ 11). Ronnoco Coffee ultimately did not complete the purchase of U.S. Roasterie's assets.

Great Western Bank ("Great Western"), a South Dakota banking corporation, also extended credit to U.S. Roasterie. (Ronnoco's Facts, ¶ 19). Great Western made three loans to U.S. Roasterie totaling over $5 million (the "Loans"), and secured the Loans with a security interest in U.S.

---

1 Westfeldt maintains it agreed to provide the coffee to U.S. Roasterie on credit in order to help its customer weather its financial issues. (Westfeldt's Facts, ¶ 4). Westfeldt's decision allegedly was based on U.S. Roasterie's representations that a large capital infusion was imminent, and that Westfeldt would be paid in full if it helped keep U.S. Roasterie afloat until the infusion occurred. (*Id.*, ¶ 5).

2 Westfeldt was aware of its status as an unsecured creditor, and attempted on several occasions, and as early as 2013, to secure the debt owed to it by U.S. Roasterie. (Ronnoco's Facts, ¶ 15). U.S. Roasterie never granted a security interest in any of its personal property to Westfeldt, however, and Westfeldt never attempted to obtain a "super-priority" purchase money security interest in the green coffee it delivered to U.S. Roasterie. (*Id.*, ¶¶ 17, 18).

Roasterie's machinery, equipment, and other property. (*Id.*, ¶¶ 19, 20).[3] Great Western filed financing statements with the Iowa Secretary of State perfecting a first-priority security interest in its collateral for the Loans, which included the green coffee that had been delivered to U.S. Roasterie by its vendors. (*Id.*, ¶¶ 21-22).

On or about October 15, 2014, one of Great Western's loans to U.S. Roasterie matured, and Great Western did not renew or extend the loan. (Ronnoco's Facts, ¶ 28). Instead, and consistent with the terms of the loan, Great Western demanded that U.S. Roasterie pay the loan in full. (*Id.*, ¶ 29). Furthermore, in accordance with the cross-default provisions contained in the other two loans, Great Western made demand upon U.S. Roasterie to cure the event of default, and upon failure of U.S. Roasterie to do so, Great Western accelerated to maturity those loans. (*Id.*, ¶ 30). U.S. Roasterie did not satisfy its obligation to pay the balance of the outstanding Loans, resulting in Great Western foreclosing the security interests which secured the Loans. (*Id.*, ¶ 31).[4]

In connection with Great Western's exercise of its remedies on the Loans, Great Western and Ronnoco Coffee continued negotiations for the sale of U.S. Roasterie's assets pursuant to a UCC private sale. (Ronnoco's Facts, ¶ 35).[5] Mid-America, a new company, eventually purchased the

---

3 Great Western also purchased certain of U.S. Roasterie's accounts receivable. (Ronnoco's Facts, ¶ 20).

4 Westfeldt maintains U.S. Roasterie's failure to make payments was "*part of a <u>coordinated plan between USR and Ronnoco</u> by which Ronnoco/Mid-America could obtain USR's assets at a substantial discount, free and clear of the debt owed to Westfeldt, and USR's employees could keep their jobs (and Howard Fischer, USR's President, could get a substantial raise)*." (Westfeldt's Response to Ronnoco-Mid-America's Statement of Contested Facts ("Westfeldt's Response to Ronnoco's Facts"), ¶¶ 29-31 (emphasis in original)).

5 Westfeldt maintains U.S. Roasterie was involved in the referenced discussions between Great Western and Ronnoco Coffee. (Westfeldt's Response to Ronnoco's Facts, ¶¶ 33-35). As support for this assertion, Westfeldt points to the deposition testimony of Ronnoco's former CEO, Meader, in which he states as follows: "As I mentioned, at some point the bank got involved, and it became somewhat of a three-way negotiation. There were three different parties; there was us, there was Howard [Fischer, U.S. Roasterie's President and CEO], and there was the bank. And we were only able to control what we were willing to pay for the business. What was happening between Howard and the bank, I really don't know." (Meader Deposition, Westfeldt's Exh. C, ECF No. 108-4, P. 30). Upon consideration, the Court finds the cited testimony does not support the proposition for which it is offered, *i.e.*, that U.S. Roasterie participated directly in the discussions between Great Western and Ronnoco. Furthermore, the proposition is directly contradicted both by Ronnoco Coffee's Chief Operating Officer and Chief Financial Officer, Eric Bomball ("Bomball"), and by Fischer, U.S. Roasterie's President and CEO. (*See* Bomball Declaration, Ronnoco's Exh. 1, ECF No. 98-1, P. 15, ¶ 14; Fischer

˅ 3 ˅

equipment, inventory, accounts receivable, and certain assets which were collateral for the Great Western Loans, for a purchase price of $2,098,670.80 (plus $35,000.00 for vehicles). (*Id.*, ¶¶ 36, 37). It is undisputed that Great Western's goal at all times was to maximize the amount it received for the sale of the collateral, and that it accepted Mid-America's best and final offer in an effort to fulfill that goal. (*Id.*, ¶¶ 38-42). The negotiated terms of the sale are set forth in the Sale Agreement effective February 9, 2015 ("Sale Agreement"), and approximately $3,150,000.00 of U.S. Roasterie's secured debt to Great Western remained unpaid after the asset sale. (*Id.*, ¶¶ 43, 48).

At the time of the asset sale, U.S. Roasterie owed Westfeldt approximately $2,690,000.00 in unsecured credit. (Ronnoco's Facts, ¶ 50). The Sale Agreement expressly stated, however, that Mid-America was not assuming any of the liabilities of U.S. Roasterie in connection with the sale. (*Id.*, ¶ 51).

Following the asset purchase, operations continued at the location in Iowa previously occupied by U.S. Roasterie. (Ronnoco's Facts, ¶ 62).[6] Mid-America employed Fischer for approximately 10 months after the sale, and Christopher Hodgson ("Hodgson"), former CFO of U.S. Roasterie, for approximately 6 months. (*Id.*, ¶ 63).[7]

Westfeldt filed its First Amended Counter-claims and First Amended Third-Party Complaint against Ronnoco, Meader and Bomball on March 6, 2017. (ECF No. 46). In its Amended Counterclaim, Westfeldt asserted the following claims against Ronnoco: Breach of

---

Declaration, ECF No. 46-6, ¶ 7).

[6] The parties disagree as to who was running the operations in Iowa. Ronnoco maintains Mid-America began its operations there after the sale, while Westfeldt maintains U.S. Roasterie "continued operations at the same location with the same facility, products, equipment, management, employees, customers, business and phone number. The only difference was it [now] had a new name, Mid-America, and no longer purported to owe substantial debt to its vendors including Westfeldt." (*See* Ronnoco's Facts, ¶ 62 and Westfeldt's response thereto).

[7] Westfeldt asserts that in a press release, Fischer stated he would continue in his current role for at least two years. (Westfeldt's Response to Ronnoco's Facts, ¶ 63, citing Press Release, Westfeldt's Exh. B-1, ECF No. 108-3, P. 5). Despite this expressed expectation, Westfeldt offers no evidence to contradict Ronnoco's contention that Fischer in fact remained in his position for only 10 months following the asset sale. (*See* Ronnoco's Facts, ¶ 71).

Contract/Successor Liability (Count I); Open Account/Successor Liability (Count II); Breach of Contract/Single Business Entity/Alter Ego (Count III); Open Account/Single Business Entity (Count IV); Unfair Trade Practices (Count V); Conversion/Civil Conspiracy to Commit Conversion (Count VI); Unjust Enrichment (Count VII); and Breach of Futures Contracts (Count VIII). Westfeldt also asserted a claim for Conspiracy to Tortiously Interfere with Contractual Relations against Third-Party Defendants Meader and Bomball (Count IX).[8]

As noted above, Ronnoco filed the instant Motion for Summary Judgment on December 1, 2017, asserting there is no genuine dispute as to any material fact, and it is entitled to judgment as a matter of law on all of Westfeldt's remaining claims. (ECF No. 96).

## SUMMARY JUDGMENT STANDARD

The Court may grant a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

A moving party always bears the burden of informing the Court of the basis of its motion. *Celotex*, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at

---

[8] In an Order entered May 22, 2017, the Court dismissed Counts III, IV, VIII, and IX of Westfeldt's First Amended

247. The nonmoving party may not rest upon mere allegations or denials of its pleadings. *Anderson*, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. *Anderson*, 477 U.S. at 255. The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Id*. at 249.

## DISCUSSION

### I. Successor Liability (Counts I-II)

Under Iowa law[9], the basic principle of corporate successor liability is that "a corporation that purchases the assets of another corporation assumes no liability for the transferring corporation's debts and liabilities. Exceptions arise only in four circumstances: (1) the buyer agrees to be held liable; (2) the two corporations consolidate or merge; (3) the buyer is a 'mere continuation' of the seller; or (4) the transaction amounts to fraud." *Lumley v. Advanced Data-Comm, Inc.*, 2009 WL 2514084, at *1 (Iowa App. Aug. 19, 2009) (citations omitted). Westfeldt contends that the third and fourth exceptions apply in this case. (Westfeldt's Memorandum in Opposition to the Motion for Summary Judgment of Ronnoco and Mid-America ("Westfeldt's Opp."), PP. 11-29). The Court will address the exceptions in turn.

### A. Mere Continuation

The Iowa Supreme Court discussed the mere continuation exception in *Pancratz v. Monsanto Co.*, 547 N.W.2d 198 (Iowa 1996). The Court first noted that "[t]he mere continuation exception, as traditionally applied, focuses on continuation of the *corporate entity*." *Id.* at 201 (emphasis in

Counter-claims and First Amended Third-Party Complaint. (ECF No. 59).
9 The Court previously ruled that Iowa law controls the successor liability issue in this case. (*See* ECF No. 43, PP. 4-6).

original) (citing *Grand Lab., Inc. v. Midcon Lab.*, 32 F.3d 1277, 1283 (8th Cir. 1994) (applying Iowa law)).

> The exception has no application without proof of continuity of management and ownership between the predecessor and successor corporations. Thus, the key element of a continuation is a common identity of the officers, directors and stockholders in the selling and purchasing corporations.

*Id.* (internal quotations and citations omitted).

The *Pancratz* Court continued to recognize that some courts had expanded the basis for mere continuation successor liability (at least in products liability cases), focusing on the continuity of the seller's business operation, rather than the continuity of its management and ownership. *Id.* The Court stated, "'[t]hus, using a kind of 'totality of the circumstances' approach, courts look at factors such as whether the successor corporation used the same employees, business location, assets, and trade name and produced the same products as the predecessor to determine if there was a continuity of the predecessor's enterprise.'" *Id.* (quoting *Grand Lab.*, 32 F.3d at 1283 (citations omitted)). Looking at its own cases, however, the Court found no departure from the traditional formulation of the rule. *See Id.* (citations omitted) ("In determining whether a successor corporation is liable under the mere continuation exception, this court has consistently looked for a continuity of management and ownership. We have never applied the mere continuation exception where the buying and selling corporations had different owners.").

In *Lumley*, the Iowa Court of Appeals considered the mere continuation exception in detail. In that case, the plaintiff signed a change of control agreement with her employer, Advanced Data-Comm, Inc. ("ADCI"), that provided certain benefits and assurances, including severance payments, to the plaintiff in the event of a change of ownership in the company. *Lumley*, 2009 WL 2514084, at *1. When WS Live, L.L.C. signed a purchase agreement to purchase the assets of ADCI, it began

operating under the fictitious name Advanced Data-Comm ("ADC"), but refused to honor the terms of plaintiff's change of control agreement. *Id.* Plaintiff sued, claiming the mere continuation exception operated to impose liability on WS Live for ADCI's debts and liabilities, including the change of control agreement. *Id.* at *2.

Citing to *Pancratz*, the Iowa Court of Appeals held that it was required to "follow the traditional approach to the mere continuation exception." *Id.* at *2. In other words, to determine whether the successor corporation was liable, it would look for a continuity of management and ownership, *i.e.*, "a common identity of the officers, directors and stockholders in the selling and purchasing of corporations." *Id.* (internal quotations and citation omitted). The Court found that although the founder, president and CEO of ADCI became the general manager and vice president of ADC, his role and duties changed, and "he did not continue to own or control the successor corporation." *Id.* at *3-4. Thus, "[b]ecause the undisputed facts demonstrate that WS Live and ADCI operated under different ownership and substantially different management, [the court found] the mere continuation exception does not apply." *Id.* at *4.[10]

Upon consideration, the Court finds it need not consider continuity of management here, because Westfeldt fails to establish a genuine issue of material fact with respect to continuity of ownership. In its opening brief, Ronnoco asserts Westfeldt cannot prove the required elements, because Mid-America had no ownership of U.S. Roasterie at any time, and Fischer, the President and owner of U.S. Roasterie, "became a mere employee of Mid-America for less than a year, during which time he acquired no direct or indirect ownership interest in Mid-America, and he otherwise never had any ownership of Mid-America in form or substance." (Memorandum in Support of

---

10 The plaintiff in *Lumley* argued that WS Live was a mere continuation of ADCI, "by virtue of continuity of name, address, phone number, logo, billing, marketing, and employees." *Lumley*, 2009 WL 2514084, at * 4. The Court rejected this assertion, however, holding that "these factors are irrelevant when evaluating the mere continuation

Motion for Summary Judgment, P. 9, citing Declaration of Eric Bomball, ECF No. 98-1, PP. 13-18, ¶¶ 7, 29-33, 35-36, 38-39).

In response, Westfeldt asserts that it was Ronnoco that maintained ownership before and after the acquisition, rather than Fischer. (Westfeldt's Opp., PP. 14-23).[11] To support this assertion, Westfeldt first points to testimony regarding Ronnoco's alleged pre-asset transfer control from Hodgson, U.S. Roasterie's former Chief Financial Officer, as follows:

> 9.  During this period [leading up to the acquisition], due to the substantial leverage that Ronnoco/Mid-America exercised over USR in light of the pending acquisition, Ronnoco/Mid-America effectively controlled USR, and USR's management had to essentially do whatever Ronnoco/Mid-America directed them to do because Ronnoco/Mid-America was about to become our new boss, so to speak. During the period leading up to the sale of the company, Ronnoco/Mid-America came in and began controlling USR by instructing myself and Howard Fisher (sic) on what to do.[12]

> 10.  One concrete example of this substantial amount of dominance and control that Ronnoco/Mid-America exercised over USR during the period leading up to the acquisition was an occasion on which Ronnoco/Mid-America directed USR to cancel a check for $85,371.23 that had been mailed to Westfeldt in exchange for Westfeldt's shipment of a large quantity of green coffee to USR.

> 11.  The specifics of this event, along with relevant background information, is as follows: during the period leading up to the signing of the formal sale papers, Westfeldt would only release shipments of green coffee to USR (which USR needed to stay afloat until the acquisition) after USR mailed a check to Westfeldt and provided Westfeldt with a tracking number so it could physically track the check. Ronnoco/Mid-America was also supplying green coffee to USR on occasion during this time period. On one occasion, after USR had already mailed a check for $85,371.23 to Westfeldt, provided

---

exception under the traditional standard." *Id.*

11 With this assertion, Westfeldt apparently abandons its contention that it was Fischer who owned both U.S. Roasterie and Mid-America. (*See, e.g.*, Westfeldt's Response to Ronnoco's Facts, ¶ 72 (disputing that Fischer was never given direct or indirect ownership of Ronnoco, Mid-America, or Ronnoco Holdings, Inc., stating instead that "[i]n the M&A Industry, Mr. Fischer, who continued to be employed as President at a significantly higher salary, may be considered a functional owner of the successor.")). Putting aside the obvious inconsistency in Westfeldt's positions (maintaining simultaneously that both Fischer and Ronnoco were the companies' owners before and after the acquisition), the Court finds no evidence that Fischer maintained any form of ownership after the asset sale.
12 The Court notes this assertion would appear to contradict Westfeldt's position that there was continuity of management before and after the acquisition, in the form of Fischer and Hodgson.

Westfeldt with the tracking number for the check, and received confirmation that Westfeldt had shipped the coffee because it believed that the $85,371.23 was in the mail, Eric Bomball, Ronnoco's CFO, called me and, after learning that USR would not be able to also pay Ronnoco/Mid-America some money owed to it for the provision [of] green coffee, directed me to order a stop payment on the $85,371.23 check that had been mailed to Westfeldt. Although I did not believe that it was the right thing to do, I had no choice other than to follow the directive of my future employer, and I reluctantly complied and requested a stop payment on the check. The stop payment went through and when Westfeldt deposited the check, it was returned as NSF. The large shipment of coffee that USR received from Westfeldt in exchange for this ultimately cancelled check was eventually roasted and sold for a profit by Mid-America after the acquisition of USR without any payment ever being made to Westfeldt.

12. Another concrete example of the control that Ronnoco/Mid-America exercised over USR during the period leading up to the acquisition was Ronnoco/Mid-America not permitting us to discuss the impending acquisition with Westfeldt, who Ronnoco/Mid-America knew to be USR's largest unsecured creditor, all the while directing USR to continue taking coffee from Westfeldt (who, as I understood, believed that it would ultimately be paid if it helped keep USR afloat) and increasing the indebtedness to Westfeldt, knowing that only the assets and not the liabilities of USR would be purchased by Mid-America.

(Hodgson Declaration, ECF No. 108-3, ¶¶ 9-12). Westfeldt next presents testimony from its

mergers and acquisitions expert, attorney Christopher Kelly, as follows:

19. The M&A [mergers and acquisitions] Industry is typically sensitive to not giving recognition to form over function, and effective "ownership" can be a matter of control just as much as it can be a matter of technical ownership, such as stock ownership. In effect then, Ronnoco's pre-Acquisition control looks like functional ownership under industry norms, and the technical form of ownership would not be controlling. As an effective owner prior to the Acquisition, there would not have been any change in ownership as a result of the Acquisition. Ronnoco effectively exercised the same ownership over U.S. Roasterie prior to the Acquisition as it did after the Acquisition. (*See* Expert Report pp. 14-15)

20. While M&A Industry professionals would view continuity of technical beneficial ownership as one factor of many for purposes of structuring a deal to avoid successor liability, such professionals would not view the factor as determinative by itself, as it is well understood that (i) technical ownership by itself is not the driving force as to continuity generally, (ii) that a selling

party who continues to benefit from the ongoing enterprise (e.g. Mr. Fischer, who continued to be employed as President at a significantly higher salary) may be considered a functional owner of the successor, and (iii) that there would be no effective change in ownership where the buyer had effective ownership prior to the transaction closing. (*See* Expert Report pp. 14-15)[13]

(Declaration of Christopher Kelly, ECF No. 108-7, ¶¶ 19-20).

From the foregoing, Westfeldt posits that the allegedly significant pre-acquisition control of the selling entity (U.S. Roasterie) by the purchasing entity (Mid-America/Ronnoco) constitutes a continuity of ownership for purposes of successor liability.

Upon consideration, the Court finds Westfeldt's contention is unsupported by Iowa law, and thus insufficient to defeat Ronnoco's Motion for Summary Judgment on the issue. As noted above, in following the traditional approach to the mere continuation exception, Iowa courts focus on both the continuity of corporate management and the continuity of ownership between the predecessor and successor corporations. *Lumley*, 2009 WL 2514084, at *2; *see also Pancratz*, 547 N.W. 2d at 201. Rather than equate corporate control with ownership, however, as suggested by Westfeldt, Iowa courts equate it with corporate management. *See, e.g.*, *Grundmeyer v. Weyerhaeuser Co.*, 649 N.W.2d 744, 752 (Iowa 2002) (emphasis added) ("However, the controlling factor [for the mere continuation exception] is whether the transferor continues to own <u>and</u> control the new corporation."). Thus, the Court agrees with Ronnoco that both ownership <u>and</u> management or control are necessary, and Iowa courts "have never applied the mere continuation exception where the buying and selling corporations had different owners." *Pancratz*, 547 N.W.2d at 201 (citation omitted).

---

13 The Court finds Mr. Kelly's opinions are internally inconsistent, as at times he asserts Mid-America/Ronnoco owned U.S. Roasterie prior to and after the acquisition, and at other times he asserts it was Fischer who was the owner/"functional owner".

The distinction between continuity of ownership and continuity of management or control is illustrated by the ruling in *C. Mac Chambers v. Iowa Tae Kwon Do Academy, Inc.*, 412 N.W.2d 593 (Iowa 1987), and later cases interpreting it. In that case In Mook Kim ("Kim") operated physical fitness and martial arts teaching centers, serving as sole shareholder, officer and director of the businesses. *Id.* at 595. When Kim's businesses started to fail his son, Ki Tae Kim ("Ki Tae"), formed a new corporation in which Ki Tae was to serve as sole shareholder, director and corporate officer. *Id.* Ki Tae's newly formed business purchased the accounts receivable and inventory from Kim's business, and installed Kim as vice president and principal instructor, responsible for the new venture's day-to-day operations. *Id.* The Iowa Supreme Court originally held that the mere continuation exception applied despite the lack of common identity of directors, officers and shareholders, stating as follows:

> It is apparent that Ki Tae Kim was made the sole director and shareholder for only one reason: to attempt to avoid liability under the continuation corporation theory (believing that lack of common directors and shareholders would be the downfall of any continuation corporation argument). Given all the other indicia of a continuing corporation it should not matter that, while his father really runs the business, Ki Tae Kim is the sole director and shareholder. We think substantial evidence supports [the] trial court's conclusion that [Ki Tae's business] was a mere continuation of [Kim's business].

*Id.* at 597.

The Iowa Supreme Court revisited its *C. Mac Chambers* decision in *Pancratz*, however. There, it emphasized that *C. Mac Chambers* did not reject the traditional approach to the mere continuation exception to successor nonliability, but rather embraced it. *Pancratz*, 547 N.W.2d at 202. The Court recognized the flaw in the *C. Mac Chambers* finding of mere continuation despite the obvious change in ownership, holding that, "in retrospect the holding perhaps better exemplifies the fraud exception, not the mere continuation exception, to the general rule of nonliability. As

recently observed by the Eighth Circuit Court of Appeals, the case 'stands for the unremarkable proposition that parties cannot circumvent the mere continuation exception by inserting relatives as sham owners and directors of a new company that is in substance the predecessor.'" *Id.* (quoting *Grand Lab.*, 32 F.3d at 1284).

Based on the foregoing, the Court finds that in order to establish a claim to the mere continuation exception, Westfeldt was required to submit evidence that Mid-America/Ronnoco actually owned U.S. Roasterie both prior and subsequent to the asset sale. Westfeldt has not done so, and so this portion of Ronnoco's Motion for Summary Judgment must be granted.

**B.    Fraud**

With respect to exception four, *i.e.*, the transaction amounts to fraud, "Iowa courts have not elaborated on the elements of such a claim." *Grand Laboratories, Inc.*, 32 F.3d at 1281. "Authorities suggest, however, that 'the fraud exception to the nonliability of successors is merely an application of the law of fraudulent conveyances.'" *Id.* (citations omitted). After concluding that the Iowa law of fraudulent conveyances applied to the claim before it, the Eighth Circuit in *Grand Laboratories* continued as follows:

> A fraudulent conveyance is…a transaction by means of which the owner of real or personal property has sought to place the land or goods beyond the reach of his creditors, or which operates to the prejudice of their legal or equitable rights. To recover on a fraudulent conveyance claim, a plaintiff-creditor must first show that the transferor actually owned the property that it allegedly fraudulently transferred. Moreover, the plaintiff-creditor must show that it was prejudiced by a transfer of assets. Prejudice requires the creditor to show that [it] would have received something which has become lost to [it] by reason of the conveyance.

*Id.* at 1281-82 (internal quotations and citations omitted).

In its earlier Order, the Court found the following allegations sufficient to set forth a claim for successor liability on the basis that the transaction at issue amounted to fraud:

16.     Upon information and belief, Ronnoco and U.S. Roasterie formulated a mutually beneficial plan so that Ronnoco could acquire all of U.S. Roasterie's assets free and clear of the substantial debt owed to Westfeldt, and U.S. Roasterie's management and employees could all maintain their employment at the new contemplated successor company.

17.     Pursuant to this plan, the parties caused or allowed U.S. Roasterie's lender, Great Western Bank, to "take control" of the assets of U.S. Roasterie so that U.S. Roasterie's assets would be sold to Ronnoco by the bank at a lesser cost rather than being sold directly by U.S. Roasterie….

29.     After the asset sale was finalized, Howard Fischer, the former CEO of U.S. Roasterie, and Scott Meader, Ronnoco's CEO, gave a joint statement to VendingMarketWatch in which Mr. Fischer stated that the sale of U.S. Roasterie to Ronnoco was part of his "exit strategy," and noted that "people at U.S. Roasterie will continue in their current roles" and "all blends, packaging and outstanding customer service remain the same."…

43.     ….[B]ecause the sale of the assets of U.S. Roasterie was a transaction entered into to escape liability, Ronnoco/Mid-America is liable to Westfeldt for the debts of U.S. Roasterie via successor liability….

(*See* ECF No. 43, P. 8, quoting Initial Counterclaim, ¶¶ 16-17, 29, 43).[14]  The Court recognized that Westfeldt had a long way to go to prove that the sales transaction was fraudulent, especially in light of the fact that Ronnoco purchased U.S. Roasterie's assets not from the company itself, but from U.S. Roasterie's secured lender, Great Western, who had foreclosed on the property.  (*See Id.*, P. 8 n. 10, citing *Grand Laboratories*, 32 F.3d at 1282 (holding plaintiff's claim for successor liability on the basis of a fraudulent transfer of assets failed, as plaintiff presented no evidence that the seller had no other creditors, that plaintiff was entitled to priority over other creditors to any extent, or that the assets the seller transferred were unencumbered)).  The Court nevertheless declined to dismiss Westfeldt's successor liability claims, finding consideration of the issue to be more appropriate on summary judgment, when the Court had a full record before it.  (*Id.*).

---

14 Nearly identical allegations appear in Westfeldt's Amended Counterclaim.  (*See* Amended Counterclaim, ¶¶ 16-17, 29, 49).

With a full record now before it, the Court finds Westfeldt fails to establish its fraud claim, for several reasons. First, there is no evidence that U.S. Roasterie, the owner of the property at issue, voluntarily sought to place it beyond the reach of its creditors (or at least one specific creditor, Westfeldt, as the property indisputably adhered to another creditor, Great Western). Instead, the record demonstrates the foreclosure did not represent a strategy on Fischer's part, but rather an involuntary taking by a secured lender because U.S. Roasterie failed to pay the debts owed.

Westfeldt attempts to counter this finding by asserting that U.S. Roasterie's "inactions (failure to make payments to Great Western Bank) that ultimately led to Great Western Bank taking control of USR's assets were part of a <u>coordinated plan between USR and Ronnoco</u> by which Ronnoco/Mid-America could obtain USR's assets at a substantial discount, free and clear of the debt owed to Westfeldt, and USR's employees could keep their jobs (and Howard Fischer, USR's President, could get a substantial raise)." (Westfeldt's Response To Ronnoco's Facts, ¶ 29). Westfeldt supports this contention with the following testimony from Hodgson:

> It was originally contemplated that Ronnoco/Mid-America would purchase the assets of USR directly from USR, but after a period of discussion, the plan changed to allowing Great Western Bank – USR's largest secured creditor – to take control of USR and for Ronnoco/Mid-America to purchase the assets of USR from the bank. My understanding is that structuring the deal in this manner would benefit Ronnoco/Mid-America more than had the assets been purchased directly from USR (Ronnoco/Mid-America could get the assets at a lesser price free and clear of debt owed to vendors such as Westfeldt), but the benefit to USR would be the same: all employees would be permitted to keep their current jobs.

(ECF No. 108-3, ¶ 14). Westfeldt also points to deposition testimony from Meader, stating "at some point the bank [Great Western] got involved, and it became somewhat of a three-way negotiation. There were three different parties; there was us, there was Howard [Fischer], and there was the bank." (ECF No. 108-4, P. 4).

The Court first finds the Meader deposition testimony does not support the notion that U.S. Roasterie, Ronnoco and Great Western all negotiated together for the sale of U.S. Roasterie's assets. Rather, while acknowledging that Great Western eventually got involved, Meader continued to state as follows: "There were three different parties; there was us, there was Howard [Fischer], and there was the bank. And we were only able to control what we were willing to pay for the business. *What was happening between Howard and the bank, I really don't know.*" (ECF No. 108-4, P. 4 (emphasis added)). This testimony is consistent with Fischer's Declaration, submitted by Westfeldt, in which he states as follows:

> 5.     In November, 2014, Great Western Bank ("GWB"), a secured lender of U.S. Roasterie, initiated foreclosure proceedings against U.S. Roasterie's assets with the intention of selling said assets at a private sale.

> 6.     Thereafter, beginning in November or December of 2014, GWB entered into discussions with Ronnoco pertaining to the potential purchase by Ronnoco of U.S. Roasterie's assets from GWB.

> 7.     I was aware of the ongoing discussions between Ronnoco and GWB *but U.S. Roasterie was not a direct participant in those discussions.*"

(Fischer Declaration, ECF No. 46-6, ¶¶ 5-7 (emphasis added)).

Next, the Court finds that Hodgson's testimony is not sufficient to establish that the asset sale was fraudulent. As noted above, Hodgson stated as follows: "It was originally contemplated that Ronnoco/Mid-America would purchase the assets of USR directly from USR, but after a period of discussion, the plan changed to allowing Great Western Bank – USR's largest secured creditor – to take control of USR and for Ronnoco/Mid-America to purchase the assets of USR from the bank." Even assuming this to be true, as noted by Ronnoco Westfeldt offers no evidence that Ronnoco instructed U.S. Roasterie not to make timely payments to Great Western, or that U.S. Roasterie would have been able to pay its debt to Great Western, but for any such alleged action on Ronnoco's

part.[15]  Given this absence, the only allegedly wrongful act on Ronnoco's part was declining to

purchase U.S. Roasterie's assets directly, instead agreeing to buy them at a foreclosure sale.[16]  As

held by the Eighth Circuit, there appears to be no basis for holding that Ronnoco had a legal or

equitable duty to accept U.S. Roasterie's offer rather than Great Western.  *See Noble Systems Corp.*

*v. Alorica Central, LLC*, 543 F.3d 978, 984 (8th Cir. 2008).  "To borrow a concept from another area

of tort law, [Ronnoco] had no duty to rescue [U.S. Roasterie], much less [Westfeldt]."  *Id.*

     As further support for its ruling, the Court notes Westfeldt offers no evidence that it was

prejudiced by the transfer of assets, *i.e.*, that it would have received something which has become

lost to it by reason of the conveyance.  *See Grand Laboratories, Inc.*, 32 F.3d at 1282.  To the

contrary, Gerald Kruger testified as follows:

> 14.    ….At all times, my only goal, and the Bank's only goal, was to maximize the amount received for the sale of the collateral….Once the Bank received what I believed to be Ronnoco Roasterie's best offer for the assets, it was my conclusion that selling the assets to Ronnoco Roasterie at that price was the best opportunity to maximize the recovery for Great Western Bank….

> 19.    ….The Purchase Price constituted only a partial payment of the over $5,200,000.00 that USR owed under the Loans, and approximately $3,150,000.00 of USR's secured debt to Great Western Bank remained unpaid after the asset sale.  If I or Great Western Bank had believed that we could recover any material portion of the deficiency by having the assets sold in some other manner, then we would have done so.

(ECF No. 98-1, PP. 49-53, ¶¶ 14, 19).  It is undisputed that U.S. Roasterie's secured debt to Great

Western had to be paid in full before any unsecured payment to Westfeldt could be made, and thus

---

15 Hodgson actually testified to the opposite, stating:  "At this time (of the negotiations between U.S. Roasterie and Ronnoco), *USR was having financial difficulties*.  It was therefore very important to me and the other officers and employees of USR that a deal with Ronnoco/Mid-America be reached—*as we saw it, the acquisition was a way (the only way) for a substantial amount of USR jobs to be saved.*"  (ECF No. 108-3, ¶ 7 (emphasis added)).
16 Ronnoco presents undisputed evidence that the foreclosure and eventual sale to Ronnoco was conducted by Great Western, and represented "a bona fide banking decision believed to be in the best interests of the Bank and was wholly consistent with the terms of the Loans and Iowa law."  (Affidavit of Gerald Kruger, Great Western Senior Vice President, Strategic Business Services, ECF No. 98-1, PP. 49-53, ¶ 15).

Westfeldt fails to show it would have received something in the absence of any alleged fraud on Ronnoco's part. *See C. Mac Chambers*, 412 N.W.2d at 596-97. This portion of Ronnoco's Motion for Summary Judgment will therefore be granted.[17]

## II.  Unfair Trade Practices (Count V) [18]

The Louisiana Unfair Trade Practices and Consumer Protection Law makes "'unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce' unlawful." *NOLA 180 v. Treasure Chest Casino, LLC*, 91 So.3d 446, 449 (La. App. 2012) (quoting La. R.S. 51:1405). "A practice is 'unfair' when it offends established public policy and when the practice is unethical, oppressive, unscrupulous or substantially injurious." *Id.* (citations omitted). Furthermore, "[a] defendant's motivation is a critical factor in order for a plaintiff to recover under LUTPA; the actions must have been taken with the specific purpose of harming the competition." *Fraiche v. Sonitrol of Baton Rouge*, 2009 WL 10679386, at *3 (M.D. La. Feb. 17, 2009).

The evidence of Ronnoco engaging in an unfair trade practice, as presented by Westfeldt, consists of the following testimony from Hodgson:

> 10.    One concrete example of this substantial amount of dominance and control that Ronnoco/Mid-America exercised over USR during the period leading up to the acquisition was an occasion on which Ronnoco/Mid-America directed USR to cancel a check for $85,371.23 that had been mailed to Westfeldt in exchange for Westfeldt's shipment of a large quantity of green coffee to USR.

> 11.    The specifics of this event, along with relevant background information, is as follows:  during the period leading up to the signing of the formal sale papers, Westfeldt would only release shipments of green coffee to USR (which USR needed to stay afloat until the acquisition) after USR mailed a check to Westfeldt and provided Westfeldt with a tracking number so it could physically track the check. Ronnoco/Mid-America was also supplying greed coffee to USR on occasion during this time period.  On one occasion, after USR had already mailed a check for $85,371.23 to Westfeldt, provided Westfeldt with the tracking number for the check,

17 In light of the above rulings, the Court need not address Ronnoco's contention that successor liability claims may not be asserted against Ronnoco Coffee, as it did not purchase any of U.S. Roasterie's assets.
18 The Court previously held that Louisiana law applies to this claim.  (*See* ECF No. 59, P. 9).

and received confirmation that Westfeldt had shipped the coffee because it believed that the $85,371.23 was in the mail, Eric Bomball, Ronnoco's CFO, called me and, after learning that USR would not be able to also pay Ronnoco/Mid-America some money owed to it for the provision [of] green coffee, directed me to order a stop payment on the $85,371.23 check that had been mailed to Westfeldt. Although I did not believe that it was the right thing to do, I had no choice other than to follow the directive of my future employer, and I reluctantly complied and requested a stop payment on the check. The stop payment went through and when Westfeldt deposited the check, it was returned as NSF. The large shipment of coffee that USR received from Westfeldt in exchange for this ultimately cancelled check was eventually roasted and sold for a profit by Mid-America after the acquisition of USR without any payment ever being made to Westfeldt.

(ECF No. 108-3, ¶¶ 10-11).

Upon consideration, the Court finds this evidence is insufficient to defeat Ronnoco's Motion for Summary Judgment, for two reasons. First, even assuming Hodgson's testimony to be true[19], Ronnoco never took any action that harmed Westfeldt. At worst, it requested that U.S. Roasterie take such an action, and it was U.S. Roasterie that ultimately ordered the stop payment on the check. Further, despite Hodgson's assertion to the contrary, he did in fact have a choice as to whether to harm Westfeldt in the alleged manner; Hodgson himself acknowledges Ronnoco at that time was his "future employer" (and only a hoped-for employer at that), and as such had no actual authority over him.

Second, the Court finds Westfeldt presents no evidence that Ronnoco's alleged action was taken "with the specific purpose of harming the competition." *Fraiche*, 2009 WL 10679386, at *3. Without evidence of such animosity on Ronnoco's part, the Court is left to conclude that Ronnoco was acting simply to protect its own financial interests, as permitted by Louisiana law. *See Cheramie Services, Inc. v. Shell Deepwater Production, Inc.*, 35 So.3d 1053, 1060 (La. 2010)

---

19 Ronnoco submits an affidavit from Eric Bomball, in which he attests in relevant part as follows: "Neither Ronnoco nor Mid-America, nor any of its management or authorized representatives, directed U.S. Roasterie to cancel or stop payment on any check issued by U.S. Roasterie to Westfeldt. Neither Ronnoco nor Mid-America, nor any of its management or authorized representatives, directed U.S. Roasterie not to pay a debt it owed to Westfeldt."

(internal quotations and citations omitted) (holding "the range of prohibited practices under LUTPA is extremely narrow", and "LUTPA does not prohibit sound business practices, the exercise of permissible business judgment, or appropriate free enterprise transactions."). This portion of Ronnoco's Motion for Summary Judgment will therefore be granted.[20]

### III.   Conversion (Count VI)[21]

Under Louisiana law, "conversion is an intentional tort and consists of an act in derogation of the plaintiff's possessory rights." *Melerine v. O'Connor*, 135 So.3d 1198, 1203 (La. App. 2014) (citation omitted). "To constitute a conversion, an intentional dispossession and/or exercise of dominion or control over the property of another in denial of or inconsistent with the owner's rights must be established." *Id.* (citations omitted).

Westfeldt points to two alleged acts on the part of Ronnoco to support its conversion claim. First, it claims "Ronnoco/Mid-America specifically directed USR to order a stop payment on the [$85,371.23] check after Westfeldt had shipped the coffee relying on the fact that the check had been put in the mail and a tracking number had been provided." (Westfeldt's Opp., P. 32). Second, Westfeldt asserts "[t]his coffee [shipped to USR in January of 2015] was transferred to Mid-America's possession after the acquisition, at which time Mid-America roasted it, sold it for a profit, and never made any payment to Westfeldt." (*Id.*).

To the extent Westfeldt claims a conversion of funds with respect to the stop payment order, the Fifth Circuit has articulated three elements which must be proven to support such a claim: "(1) that [the plaintiff] owned the funds allegedly misused by the defendant; (2) that the misuse was

---

(Declaration of Eric Bomball, ECF No. 98-1, PP. 13-18, ¶¶ 26-27).

20 With respect to Westfeldt's unfair trade practices claim regarding Ronnoco's alleged liability for the nearly three million dollar debt owed by U.S. Roasterie, the Court finds said claim fails for the reasons set forth in Ronnoco's submissions.

21 The Court previously held that Louisiana law applies to this claim.  (*See* ECF No. 59, P. 11).

inconsistent with the plaintiff's rights of ownership and (3) the misuse constituted a wrongful taking of the funds." *Zaveri v. Condor Petroleum Corp.*, 27 F.Supp.3d 695, 708 (W.D. La. 2014) (citing *Chrysler Credit Corp. v. Perry Chrysler Plymouth, Inc.*, 783 F.2d 480, 484 (5th Cir. 1986)). The Court finds Westfeldt cannot establish the first element, because it makes no claim to have "owned" the funds allegedly en route to it. Furthermore, as noted above Ronnoco did not misuse the funds; at most, it requested (without authority) that U.S. Roasterie take action on its behalf.

With respect to the shipment of coffee itself, the Court agrees with Ronnoco that if it came into possession of said coffee at all, it did so by purchasing it from Great Western after the foreclosure. Under these circumstances, Westfeldt fails to establish that Ronnoco acted in derogation of Westfeldt's possessory rights, *see Melerine*, 135 So.3d at 1203, and so its claim for conversion necessarily fails.

## IV.  Unjust Enrichment (Count VII)[22]

Under Iowa law, "[t]he doctrine of unjust enrichment is based on the principle that a party should not be unjustly enriched at the expense of another or receive property or benefits without paying just compensation." *Brinkmann v. St. Paul Fire & Marine Ins. Co.*, 2006 WL 1750491, at *2 (Iowa App. Jun. 28, 2006) (citation omitted). "One asserting a claim of unjust enrichment must establish three propositions: (1) defendant was enriched by the receipt of a benefit, (2) the enrichment was at the expense of the plaintiff, and (3) it is unjust to allow the defendant to retain the benefit under the circumstances." *Id.* at *3 (citation omitted).

In support of its claim for unjust enrichment, Westfeldt claims "Mid-America/Ronnoco were enriched by the receipt of a massive benefit, namely, USR's receipt of numerous and valuable shipments of coffee in 2014, during the pre-acquisition period, that were never paid for, and were

ultimately transferred to Mid America upon the acquisition, and then roasted and sold by Mid-America for a profit." (Westfeldt's Opp., P. 33).  Upon consideration, the Court finds this assertion again ignores the reality that it was U.S. Roasterie that received the coffee shipments from Westfeldt; any inventory eventually acquired by Ronnoco came from Great Western.  Under these circumstances, it is not unjust to allow Ronnoco to retain any alleged benefit, and so this portion of Ronnoco's Motion for Summary Judgment will be granted.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Counterclaim Defendants Ronnoco Coffee, LLC and Mid-America Roasterie, LLC's Motion for Summary Judgment (ECF No. 96) is **GRANTED**, and judgment is entered in their favor on Westfeldt's Counterclaims.  A separate Judgment will accompany this Order.

Dated this  15th  Day of February, 2018.

/s/ Jean C. Hamilton
_____
UNITED STATES DISTRICT JUDGE
JEAN C. HAMILTON

---

22 The Court previously held that Iowa law applies to this claim.  (*See* ECF No. 59, P. 12).